W. W. GRAINGER, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 81–1919.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1982.

Decided April 30, 1982.

Edwin C. Thomas, Bell, Boyd & Lloyd, Chicago, Ill., for petitioner.

Catherine Garcia, N. L. R. B., Washington, D. C., for respondent.

Before SWYGERT, Senior Circuit Judge, POSNER, Circuit Judge, and BARTELS,* Senior District Judge.

POSNER, Circuit Judge.

This is a petition to set aside an order of the National Labor Relations Board. The order was based on a finding that the petitioner, a manufacturer of electrical equipment, had coercively interrogated a worker, in violation of section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1).

The worker is Wayne Jaske. He worked the night shift in one of the petitioner's warehouses. One morning, having just left the warehouse at the conclusion of his shift, Jaske found a large nail propped against the tire of his car—deliberately placed by someone on the day crew, he thought, to puncture the tire when he drove away. With the nail in one hand and a three-foot-long ice scraper in the other, Jaske, in a fury, went back into the warehouse to confront the day crew. He shouted threats and obscenities at them. He swung the ice scraper in a menacing manner, almost hitting one of the day crew. The threats (to "bash in" the head of the person who had planted the nail), the curses, the flailing ice scraper, his "bug-eyed" red face added up, in the view of the onlookers, to "very worrisome, 'crazy' behavior." After investigation, the petitioner fired him. But between his outburst and his discharge Jaske had become involved in the efforts of a union to organize the warehouse; and when he was fired, the union filed a charge with the regional director of the NLRB, who in turn filed a complaint against the petitioner with the Board, charging that Jaske had been fired for his union activities, in violation of section 8(a)(3) of the National Labor Relations Act.

In preparation for the hearing on this complaint, Jaske's former supervisor, together with the petitioner's lawyer, paid a visit to Jaske at his home early one evening to interview him. They knocked at his door. When he opened it, the following conversation—according to Jaske's testimony, which we quote—ensued in the hallway outside of his apartment:

. . . [T]his gentleman said, "Hi, I'm Ed Thomas, Counsel for W. W. Grainger. This is Joe Lyon. We'd like to ask you a few questions." I immediately said, "No, I don't think so."

Ed Thomas said, "Oh, I've never heard of any witness doing that before. Most witnesses are willing to talk to me." I said, "You'll have to talk to Roberta Brown [the Board's lawyer who was handling the complaint against the petitioner] and get her permission first." He again asked, "Are you sure you won't answer just a few questions?" I again said, "No. You're going to have to get in touch with Roberta Brown and get her permission first."

Mr. Thomas then said, "Oh. I understand you played football for Nebraska." I replied, "No, it wasn't Nebraska. It was Nebraska Wesleyan."

"What did you play?"

"I played tackle."

"I also understand you had a knee operation."

I replied, "Yes, I did."

He then said, "Oh. I played football and didn't ruin my knee." I then replied, "I didn't hurt it playing football. I hurt it playing basketball."

* Of the Eastern District of New York.

He then asked me again if he could come in and ask me just a few questions. I again said, "No. You'll have to get in touch with Roberta Brown. If she is willing to let me talk to you, I would be more than happy to; but I want her permission first or at least to have her present."

He then dug into his briefcase and brought out a piece of paper and what looked like a check. I put up my hands in refusement, not knowing what it was I was being served. He said, "Oh, you don't have to worry. This is just a subpoena from the company and check that goes along with it." I took the piece of paper, which turned out to be a subpoena and a check; and he said, "Thank you, Wayne. We'll get in touch with Roberta Brown," and then I shook hands with Joe Lyon.

This interview resulted in the regional director's amending his complaint to add a charge that the petitioner had interfered with Jaske's rights under section 7 of the Act, in violation of section 8(a)(1). A hearing was held on the complaint. The administrative law judge held that Jaske's discharge had not been related to his union activities and that the attempted interrogation of Jaske had not interfered with any rights protected by section 7, and he ordered the complaint dismissed. On appeal, the Board sustained the dismissal of the charge of unlawful discharge but reversed the administrative law judge on the coercive-interrogation charge.

■ It is, of course, a violation of section 8(a)(1) of the Act for an employer to interfere with the right of an employee under section 7 to engage in union-organizing activities. And while the employer has every right to interview employees in preparation for a hearing before the National Labor Relations Board, he may not use the interview to discourage the employee from testifying freely at the hearing. To interfere with the employee's use of the administrative protections afforded by Labor Board proceedings is to interfere, indirectly but culpably, with the right of organization pro-tected by section 7. E.g., *Satra Belarus, Inc. v. NLRB*, 568 F.2d 545, 547 (7th Cir. 1978). It is an even more palpable violation to use the interview to discourage the employee directly from engaging in union activities.

■ We do not understand, however, how the Board could have thought these precepts applicable to the facts of this case. To begin with, Jaske was not even an employee of the petitioner at the time of the interview. True, he was a prospective employee, because the Board had not yet decided that his discharge had been lawful; and the petitioner has waived, by failing to make to the Board, see 29 U.S.C. § 160(e), any argument it might have had that the interrogation of a prospective employee is outside the scope of section 8(a)(1). But Jaske knew that if he was reinstated it would be by action of the Board and not by a change of heart by the petitioner. He therefore had no incentive to ingratiate himself with the interviewers. So there was no carrot. Neither was there stick. Nothing in the circumstances of the interview could have intimidated Jaske. The interview took place on the landing outside Jaske's apartment rather than on the petitioner's premises or in its counsel's office. Jaske refused to cooperate, and that was the end of it. The mildness displayed by the interviewers could only have emboldened Jaske, if he needed emboldening, to testify fearlessly in the forthcoming Board hearing.

There was, in short, no hint of either threat or promise that could have deflected Jaske—not a mouse—from vigorously pursuing his remedies with the Board, or could have discouraged employees of the petitioner from engaging in union activities.

In finding to the contrary, the Board relied in part on the fact that Jaske had lied when he indicated to the interviewers that they would have to get Roberta Brown's permission to interview him. She was not his lawyer but the Board's lawyer. The Board thought the fact that Jaske had lied confirmed his testimony that he had been "nervous" during the interview. We are

willing to credit, unlikely as it seems, that Jaske was nervous; but this does not show that the circumstances were intimidating. If Jaske had been intimidated, he would have consented to be interviewed; he would not have fobbed off his questioners with a lie.

What the Board primarily relied on in finding coercion was the interviewers' failure to give the Board's version of the *Miranda* warnings. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Just as the police are required to inform people who are in custody of their constitutional rights before interrogating them, to assure that the interrogation will not be coercive, so the Board takes the position that the questioning of employees by the employer is inherently coercive unless, at the outset of the interview, the employer tells the employee the purpose of the interview and assures him that there will be no reprisals if he refuses to play ball. *Johnnie's Poultry Co.*, 146 N.L.R.B. 770, 774 (1964), vacated, 344 F.2d 617 (8th Cir. 1965). Neither of these assurances was given here—but there was no time to give them. Jaske refused to answer questions before the interviewers had a chance to explain the purpose of the interview beyond the obvious, which was that it was connected with the case before the Board, and before they had a chance to assure him that there would be no reprisals. The time for the warnings is when the witness has indicated a disposition to cooperate or at least before he has ruled out cooperation. Once he has refused to answer any questions there is no longer any point in giving him warnings whose purpose is to ensure that any answers he does give will not be the result of coercion.

There are cases where the *Johnnie's Poultry* warnings make sense and others where they do not. No court has been willing to defer to the Board's attempts to require the warnings regardless of context. See, e.g., *A & R Transp., Inc. v. NLRB*, 601 F.2d 311 (7th Cir. 1979), and cases cited therein. The failure to give the warnings could not have been coercive in the circumstances of this case, and cannot make up for the absence of other substantial evidence of interference with protected rights. The Board's order is

Set Aside.