**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**THILL, INCORPORATED, Respondent.**

No. 91–3918.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1992.

Decided Dec. 8, 1992.

**1138**

Joseph Oertel (argued), Aileen A. Armstrong, Peter D. Winkler, Washington, D.C., Joseph A. Szabo, Director, N.L.R.B., Milwaukee, Wis., for petitioner.

Terence A. Schuster and Myron E. Ropella (argued), Ropella & Associates, Milwaukee, Wis., for respondent.

\* Hon. Milton I. Shadur, of the Northern District

Before POSNER and COFFEY, Circuit Judges, and SHADUR, Senior District Judge.\*

POSNER, Circuit Judge.

The Labor Board asks us to enforce an order that requires an employer to bargain with a union and take other steps to remedy alleged misconduct committed by the employer many years ago. In 1980, Thill, a nonunion metal fabricator, announced that it was cutting the wages of all its employees by 15 percent because of business adversity. This announcement stimulated union organizing activity and in a representation election conducted in March of the following year the auto workers' union was elected, by a two-thirds vote, the exclusive bargaining representative for a unit consisting of the company's 70 to 80 production and maintenance employees. Bargaining ensued, but an agreement was never reached. The union filed unfair labor practices charges the same year (1981), and two years later an administrative law judge issued a remedial order to which the company promptly filed exceptions with (i.e., appealed to) the Board. In 1990, having had the case under advisement for seven years, the Board finally issued a brief opinion adopting (i.e., affirming) the administrative law judge's decision without remarking on its delay in deciding the appeal. The company filed a motion for reconsideration, which the Board kept under advisement for another year before denying in a two-and-a-half-page (double-spaced) order. The order stated that employee turnover during the seven years in which the Board had had the matter under advisement was irrelevant to the appropriateness of the bargaining order.

■ The order that the Board asks us to enforce has three parts. The first, which is entirely conventional, directs the company to cease and desist from the type of unfair labor practices that the Board found had been committed during the election campaign and the ensuing, though abortive, bargaining. We think this part of

of Illinois, sitting by designation.

the order must, with one exception, be enforced. Although the unfair labor practices are for the most part pretty small beer—such things as two written reprimands (but no other discipline) that may have constituted selective enforcement of the company's work rules against union activists or supporters; the omission, found by the Board not to have been merely a consequence of typographical errors, of contract terms orally agreed upon from drafts that the company typed up; and a trivial change in the terms of the employee health plan which the company failed to discuss with the union—we cannot say that the Board's findings on these points are unsupported by substantial evidence on the record as a whole.

■ The company takes vigorous exception to the Board's finding that it promised to restore the 15 percent wage cut, then broke its promise in order to punish the workers for voting in the union. Had the company merely said that the wage cut was temporary and would be reexamined in light of changes in the business environment, there would be no promise and therefore no basis for the Board's finding. And that was all the company said—in writing. But there was a good deal of evidence, which the Board was permitted to credit, that Mr. Thill, the company's president, orally promised to restore the wage cut. According to one witness, "He promised that as of July 1, 1981, we would either get our fifteen percent back or he would close the plant.... [S]omeone did ask the question could we have that in writing. And he said he was a man of his word. He didn't need to."·

What is more, when the company rescinded the cut and raised wages to their previous level, it delayed the effective date of the raise for the workers in the bargaining unit, i.e., the workers represented by the union. Its defense against what on its face seems unlawful discrimination against workers for exercising their statutory right to bargain collectively, 29 U.S.C. § 158(a)(1); *NLRB v. Industrial Erectors, Inc.*, 712 F.2d 1131, 1135 (7th Cir.1983), is that it had to consult with the union before changing wages in the bargaining unit. This is true, but of course the union was not averse to the rescission of the wage cut—that cut had been the catalyst for the union's successful organizing campaign. It just objected, as was its right, to the discriminatory treatment of the workers that it represented.

■ The company also takes vigorous exception to the finding that it was unreasonable in insisting, during the bargaining sessions, that the union agree not to solicit members or engage in other activities "on Company time, except as expressly permitted under subsequent provisions of this agreement." The Board believed that the workers might misunderstand this to mean that they could not engage in any union activities on the company's property, and therefore that the company was bargaining in bad faith in insisting on the provision. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 803 n. 10, 65 S.Ct. 982, 988 n. 10, 89 L.Ed. 1372 (1945); *Lechmere, Inc. v. NLRB*, —— U.S. ——, ——, 112 S.Ct. 841, 846, 117 L.Ed.2d 79 (1992). The danger of such a misunderstanding was doubtless slight, especially as the handbook that the company furnishes every employee permits union activities "in non-work areas during non-work time." But the handbook purports to be a statement of the company's work rules, and the management-rights clause upon which the company also insisted authorizes the company to change its work rules unilaterally. While we might have thought it plain that "Company time" meant the time in which the workers are supposed to be working, rather than before or after work or while taking lunch or coffee or other breaks, the company conceded that "company time" was not a synonym for "working time." In these circumstances, the company's obduracy in refusing to agree to clarify the terminology in the collective bargaining contract smacks of bad faith.

■ We cannot, however, uphold the Board's finding that the company engaged in "coercive interrogation." If a company's foremen or other supervisory employees question workers in a manner calculat-

ed to intimidate them, as by hinting reprisals for their supporting the union, the company is guilty of the unfair labor practice that the Board calls coercive interrogation. *NLRB v. Gold Standard Enterprises, Inc.*, 679 F.2d 673, 676 (7th Cir.1982). Interrogation is not unlawful per se, however, *NLRB v. Ajax Tool Works, Inc.*, 713 F.2d 1307, 1314 (7th Cir.1983) (per curiam); *Hotel Employees & Restaurant Employees Union v. NLRB*, 760 F.2d 1006 (9th Cir.1985), and what we have here cannot fairly be called coercive. After the union was elected exclusive bargaining representative—during the bargaining sessions that ensued—one of Thill's foremen asked a union steward how much the union was trying to get for the workers and whether the steward could afford a strike, asked another employee whether he could afford to strike in view of the loss of income to him caused by the 15 percent wage cut, and asked a third employee whether he would honor a strike call by the union. The foreman questioned several other employees in the same vein. The Board thought the foreman's conduct coercive because the workers he questioned constituted a "captive audience" and because he was trying to "ferret out" possible differences between the union and the workers it represented. The administrative law judge contrasted interrogation on the company's premises with "idle conversation or light-hearted talk away from the scene of employment in an informal setting," and mentioned the foreman's failure to make an express disclaimer of reprisals. But we do not understand the Board to be attempting to require *"Johnnie's Poultry"* warnings—the Board's version of the *Miranda* warnings, intended for interviews in preparation for unfair labor practice hearings, which the interviews in this case were not. *W.W. Grainger, Inc. v. NLRB*, 677 F.2d 557 (7th Cir.1982). And if the questioning had taken place in the workers' homes, the Board might have inferred coercion from the fact that the company was pursuing the workers after hours. Cf. *id.* at 559. Neither the Board nor the courts have a consistent view concerning the significance of different types of location for an inference of coercion. See *Hotel Employees & Restaurant Employees Union v. NLRB, supra; Gossen Co. v. NLRB*, 719 F.2d 1354, 1358–59 (7th Cir.1983); *NLRB v. Industrial Erectors, Inc., supra*, 712 F.2d at 1134–35; *First Lakewood Associates v. NLRB*, 582 F.2d 416, 418–19 (7th Cir.1978); *NLRB v. Pope Maintenance Corp.*, 573 F.2d 898, 904 n. 13 (5th Cir.1978).

The reference to "captive audience," and particularly the contrast drawn between "ferret[ing] out" and "idle conversation," make it seem that the Board will deem any attempt by an employer to discover its workers' attitude toward a possible strike call by the union "coercive." This position is difficult to understand if we are correct that interrogation of workers is not a per se violation of the National Labor Relations Act—as the Board itself affects to believe. See *Hotel Employees & Restaurant Employees Union v. NLRB, supra.* For the *only* relevant interrogation is that concerning labor relations. The subject matter of the interrogation, therefore, cannot condemn it. Only the manner. If the foreman asks loaded questions containing implicit threats of reprisal for the exercise of statutorily protected rights, or won't accept the worker's refusal to answer his questions, or badgers the worker with incessant questions that interfere with his work, then the interrogation is "coercive" in the sense of likely to interfere with the exercise of statutory rights. But merely to inquire into a worker's attitude toward a strike call cannot be regarded in that light.

Of course the company is interested in possible differences between the rank and file and the union leadership concerning a strike; and if the Board had a rule that any attempt to "ferret out" those differences is unlawful because it weakens the union's ability to present a united front to the employer, we would have a different case. But we do not understand the Board to have such a rule. The employer's right to play divide and conquer is not unlimited; in particular it is forbidden to make side deals with individual employees that override the collective bargaining contract. *J.I. Case Co. v. NLRB*, 321 U.S. 332, 338, 64 S.Ct.

576, 580, 88 L.Ed. 762 (1944). That would undermine the cartel of workers that it is the main purpose of unionization to create. So far, however, the only *interrogation* that is forbidden is that which can be called coercive, implying something more than unhelpful to the union's effort to present an appearance of unanimity; and there is no evidence of coercion here.

■ The Board's lawyer defends the finding of unlawful interrogation by reference to a coercive atmosphere created by the company's other unfair labor practices. This defense is improper because it was not a ground of the Board's decision, or of the administrative law judge's decision, which the Board's decision in the main adopts and which refers to the "surrounding circumstances" as additional evidence of coercion but does not explain which circumstances it means. The defense thus violates the *Chenery* doctrine. It is an intrinsically weak ground, to boot, in a case such as this where the other unfair labor practices are not flagrant, but indeed are gossamer thin. A couple of reprimands, but no discharges; typographical errors that may have been deliberate; a broken promise; a minor change in a benefit plan; a semantic wrangle—unfair labor practices, yes, but not of a sort likely to create an atmosphere of fear and intimidation. The Board was wise not to mention "coercive atmosphere"; but wise or not, its counsel is not permitted to defend its decision on grounds other than its own.

We would have a different case if testimony by the interrogated workers themselves had established that a course of interrogation which to the reader of a cold transcript might seem entirely innocuous was subtly but effectively coercive. On this all the administrative judge said (the Board said nothing) was that several of the workers questioned by the foreman "gave a vague answer or none at all" and that "other employees kept a record of the questions and submitted the list to the Union all of which showed that the employees felt restrained." The second point would be telling if true, but it is not, since the administrative law judge had already found that the union steward had requested the employees to record the questions asked them. To treat this as evidence of coercion would empower the union to prevent all interrogation simply by asking questioned workers to write down the questions. As for the first point, we cannot see how giving a vague answer or none at all could be considered evidence of coercion. On the contrary, the more complete the employee's response to questions, the stronger the inference of coercion. The administrative law judge's point amounts to saying that if a suspect refuses to confess to the police, this shows that he must have been subject to coercive interrogation!

■ The second part of the Board's order directs the company to reinstate the 15 percent wage cut for members of the bargaining unit retroactive to the date on which it was reinstated for the company's other workers, with interest since 1981. Since we agree that the failure of the company to make the reinstated wage retroactive for the workers represented by the union was an unfair labor practice, those workers' entitlement to backpay cannot be doubted. The question is interest—a potentially impressive sum after eleven years, though we have not been told how much. The company argues that the amount of interest is due largely to the Board's inexplicable delays in deciding the company's appeal from the administrative law judge's decision and the company's motion to reconsider the Board's decision in that appeal. That is true. The Board took eight years to decide those two matters; it should have taken far less time. But the company was not harmed, so far as the backpay order is concerned. The Board's delays meant that the company had that much more time to enjoy the use of the money that it should have given its workers back in 1981. The interest component of the backpay order merely transfers the fund built up by the Board's delays to its rightful owners. *NLRB v. J.H. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 265, 90 S.Ct. 417, 421, 24 L.Ed.2d 405 (1969); *NLRB v. Ironworkers Local 480*, 466 U.S. 720, 104 S.Ct. 2081, 80 L.Ed.2d 715 (1984) (per curiam).

■ The third part of the order, and by far the most questionable, is the command that Thill bargain with the union. This would be rational if there were reason to believe that the union retains the support of a majority of the workers in the bargaining unit, but not otherwise. *Mosey Mfg. Co. v. NLRB*, 701 F.2d 610, 613 (7th Cir. 1983) (en banc); *NLRB v. P\*I\*E\* Nationwide, Inc.*, 894 F.2d 887, 893–94 (7th Cir. 1990); *Montgomery Ward & Co. v. NLRB*, 904 F.2d 1156, 1160–63 (7th Cir.1990) (concurring opinion). The National Labor Relations Act is concerned with protecting workers against unwanted unions as well as against union-busting. *Mosey Mfg. Co. v. NLRB, supra*, 701 F.2d at 613; *Harper & Row Publishers, Inc. v. NLRB*, 476 F.2d 430, 437 (8th Cir.1973). There is no reason to believe that the union retains the support of a majority of Thill's production and maintenance workers. Out of the 70 to 80 members of the bargaining unit, only 10 remain from 1981. During this period, the ownership and management of Thill have changed, and its plants are in process of being relocated. The Board may not have known all these things when it issued the bargaining order in 1990 but it did know that nine years had elapsed since the breakdown in bargaining, seven of them as a result of its own delay in deciding the company's appeal. The Board's opinion is silent on the delay, which the Board not only makes no effort to justify or explain but does not deign even to mention. Yet delay is not a new problem for the Board— in 1989 the average age of unfair labor practice cases awaiting decision by the Board was more than two years from the filing of the unfair labor practice charge and almost one year from the decision by the administrative law judge. 54th NLRB Ann.Rep. 249 (1989) (tab. 23). The Rip Van Winkle of administrative agencies woke up in 1990 thinking it was still 1983.

In its order denying Thill's motion for reconsideration the Board finally mentioned the delay but was content to pronounce the possibility of employee turnover irrelevant: "As the Respondent's unfair labor practices began shortly after the Charging Party's [i.e., the union's] certification [as collective bargaining representative], the bargaining order restores the status quo ante and employee turnover raises no 'unusual circumstances' affecting that status." It distinguished our decision in *Montgomery Ward*, where we vacated a bargaining order in circumstances similar to those of this case, as a case in which the bargaining order had been issued in favor of a union that had lost the representation election. That made it, in one respect, indeed a more egregious case for a bargaining order; on the other hand the election had been close, the Board had had the case under advisement for a "mere" six years (not eight as here), and, most important, the company had been guilty of a "myriad of serious and far-reaching unfair labor practices in flagrant violation of the Act." 904 F.2d at 1157.

The Board's lawyer reminds us that his client has broad discretion in the formulation of remedial orders. Many cases say this. E.g., *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1940 n. 32, 23 L.Ed.2d 547 (1969); *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 405–06, 13 L.Ed.2d 233 (1964). We do not question it as a general rule. But even less than in other settings of judicial review of administrative action is our role in reviewing a Board order that of a rubber stamp. The remedial structure of the National Labor Relations Act (on which see *NLRB v. P\*I\*E Nationwide, Inc., supra*, 894 F.2d at 890– 93) is peculiar, possibly because of persisting congressional distrust of the Board. Unlike the orders of other agencies, the Board's orders are not self-executing. That is, they do not become judicially enforceable, by contempt or some other sanction, merely by exhaustion of judicial remedies by the person against whom the order runs. A party can challenge an order of the Board in court, and lose its challenge— and violate the order with impunity. To put teeth into one of its orders the Board must persuade a court of appeals to enforce the order—in effect, to issue an injunction commanding obedience to the order. That is what it has tried to do here.

(Often it will do so in a cross-petition to a party's petition for review of the order.) In doing so it necessarily has appealed to our equitable discretion, and the respondent is therefore entitled to present to us any considerations bearing on the exercise of that discretion. *Id.* at 892–93. That entitlement would be obvious if, as sometimes happens, the Board, having issued an order, waits years to seek enforcement, hoping that the respondent will comply voluntarily and spare the Board the expense of a court proceeding. *Id.* Much can happen over the course of years to affect the equities of commanding obedience to an order. This case is functionally the same as one in which the Board delays in seeking enforcement. There is that gap of seven years while the Board sat on this case and the bargaining order that the administrative law judge had issued grew increasingly stale. If the Board wanted us nevertheless to enforce the order it had to give reasons why the passage of time had not destroyed the order's utility. It gave no reasons; it did not, as we have emphasized, so much as mention the delay, even though delay is a common ground for judicial refusal to enforce a bargaining order. *Id.* at 893–94, and cases cited there; *Texas Petrochemicals Corp. v. NLRB*, 923 F.2d 398, 404–05 (5th Cir.1991). Reminded of the delay by the employer's petition for reconsideration, the Board declared it irrelevant with no explanation beyond the summary passage quoted earlier.

At argument the Board's lawyer under questioning conceded that a remand for reconsideration of the bargaining order would be proper even if we upheld all the unfair labor practice findings, which we have not done. But a remand for reconsideration of the bargaining order would not be good enough. Suppose the Board reconsidered and reissued the order, and again sought enforcement (or the company petitioned for review). By the time the order was enforced—if it was enforced—and all further judicial remedies exhausted, it would be 1993 or 1994, assuming, as we have no right to do, no further extraordinary delays in this proceeding. Here as in *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1370 (7th Cir.1983), the likelihood that a bargaining order effective in 1994 would be an apt remedy for the fairly tepid misconduct that occurred back in 1981 is too remote to warrant protracting this proceeding further. See also *Montgomery Ward & Co. v. NLRB*, 904 F.2d at 1160–63 (concurring opinion). Armed with the cease and desist order, the union, which remains the exclusive bargaining representative of the production and maintenance workers, can if it wishes seek to reopen the bargaining process with the company. The company will doubtless want evidence of current support for the union, but if the union lacks the support of the workers whom it is supposed to be representing, it should not be bargaining on their behalf. In the unusual circumstances of this case the union is not entitled to the shortcut that a bargaining order might provide. *Peerless of America, Inc. v. NLRB*, 484 F.2d 1108, 1119–20 (7th Cir.1973); *Ithaca College v. NLRB*, 623 F.2d 224, 229–30 (2d Cir.1980).

To summarize, the cease and desist order will be enforced if modified consistently with this opinion. The backpay order will be enforced in full. The bargaining order will not be enforced.

Enforcement Granted in Part, Denied in Part.