In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-3634, 99-3994

Naperville Ready Mix, Inc., et al.,

Petitioners/Cross-Respondents,

v.

National Labor Relations Board,

Respondent/Cross-Petitioner,

and

Teamsters Local 673,

Intervening Respondent/Cross-Petitioner.

On Petition for Review and Cross-Application
for Enforcement of an Order
of the National Labor Relations Board
Nos. 13-CA-31031, et al.

Argued September 28, 2000--Decided March 6, 2001

  Before Manion, Rovner, and Diane P. Wood, Circuit
Judges.

  Diane P. Wood, Circuit Judge.  Richard Wehrli
owned several companies in Naperville, Illinois,
which were involved in the concrete and trucking
businesses. This case arose when one of the
companies, Naperville Ready Mix, Inc. (NRM),
decided to change the way that it would deliver
concrete. The National Labor Relations Board (the
Board) concluded that NRM and several other of
Wehrli's companies were a single employer for
purposes of the labor laws, and it further found
that the company had violated various sections of
the National Labor Relations Act (the Act)
through its efforts to transfer bargaining unit
delivery work from employees to alleged
independent owner-drivers. NRM and its
affiliates, T&W Trucking, Inc. (T&W), and Wehrli
Equipment Co. (WEC), have asked us to set aside
the Board's order requiring reinstatement of
certain drivers and restoration of the bargaining
unit work; the Board requests enforcement of its
order. We conclude that the Board's order is
supported by substantial evidence and the law,
and we thus conclude that it is entitled to
enforcement.

I

Wehrli incorporated NRM in 1960, with himself and his wife Judith Wehrli as the only stockholders. Wehrli served as NRM's president, and as of 1992 the company's board consisted of Richard and Judith Wehrli, Richard's brother-in-law Jerome Doll and the Wehrlis' son Robert. In 1978, Wehrli incorporated WEC to provide repair services for NRM dump trucks and other trucks at NRM's facility on High Grove Street in Naperville. Wehrli is the sole shareholder of WEC; he served on its board of directors through 1992, when he was replaced by his son Scott. In 1987, Wehrli and a supervisor at NRM, Robert Tilly, added T&W trucking to the family of companies. Through 1992, they were T&W's sole directors and shareholders. At the time of the events relevant to this case, T&W was providing hauling services for only two companies: NRM and one other.

Ready-mix truck drivers at NRM were covered by a collective bargaining agreement that Wehrli had originally negotiated with Teamsters Local 673 (the Union) in 1986. On April 21, 1992, NRM and the Union began negotiating a successor agreement for the one that was due to expire nine days later, on April 30. The Union's principal representative was its Secretary-Treasurer, Tom Custer, while Wehrli spoke for NRM. At the initial meeting, the Union presented a comprehensive written proposal seeking increased wages and pension benefits as well as improved job protection standards for the drivers. NRM rejected the proposal and countered with a one-year roll-over offer, with a few revisions to the health and pension plan provisions. Wehrli argued that concessions from the Union were necessary because of increased competition and declining profit margins in the ready-mix business. In the absence of concessions, he warned, he would either have to suspend trucking operations until the market improved or get out of the hauling business altogether.

When the parties met again on May 7, the Union tried to take the contract items one-by-one. NRM was not receptive to this tactic; Wehrli saw it as a ploy by the Union to win benefits comparable to those it had secured with the Northern Illinois Ready Mix Association (NIRMA), a local multi-employer bargaining group. Wehrli claimed that NRM was losing money on the delivery portion of its business, and he announced that he wanted to sell NRM's trucks and operate with owner-operator subcontractors. Custer responded by saying that if NRM were to make such a move it would have to become a party to the NIRMA

agreement (as other similarly situated companies had done), which gave owner-operators the protections of union membership. Custer also commented that the Union was there to negotiate a contract, not to help NRM sell its trucks.

On May 12, Wehrli sent Custer the following letter:

I have decided to go out of the trucking business and am offering to sell my trucks to my present drivers first, and then any leftover trucks will be offered to outsiders. I intend to use individual contractors for all my trucking needs. If you want any discussion with me in this regard feel free to call.

Custer saw this letter as a part of the overall bargaining give-and-take, as it reflected the position Wehrli had taken at the two previous bargaining sessions. He therefore saw no need to, and did not, specifically reply to the letter.

The parties held another bargaining meeting on May 14, at which they made some progress. The Union agreed to remove certain demands, and NRM agreed to modify the language in several contract clauses. Wehrli continued to assert that he intended to sell the trucks. To this end, he introduced a proposal to delete Article 24 from the contract. Article 24 provided that certain owner-operator subcontractors would be treated like bargaining unit employees for purposes of wages, union security, and benefits. Wehrli wanted it deleted because it would have defeated much of the point of his plan to sell NRM's ready-mix trucks and to rely on subcontract haulers. He made it clear that under his proposal, the new subcontract haulers would not be members of the NRM employee bargaining unit. On May 15, he reduced his proposal to writing.

Without waiting for the Union's response, Wehrli proceeded to hold meetings with NRM's drivers on May 20 and May 27. The Union had no notice of these meetings and did not approve them. At the meetings, Wehrli discussed the financial difficulties he faced and informed the drivers of his intention to sell the trucks. He promised that he would make the trucks available for purchase by current drivers and that he would assist them with the logistics of becoming owner operators and with financing the purchase of the trucks. Wehrli also stated as a fait accompli that if the drivers became subcontractors they would no longer be covered under the Union's contract with NRM. Finally, he informed the drivers that as trucks were sold to current NRM and outside drivers, current drivers who had not purchased trucks would be laid off in reverse

order of seniority.

After Wehrli's May 20 meeting, Custer met with the drivers to discuss the status of the negotiations. The union members voted to reject NRM's May 15 proposal, and they authorized the Union to call a strike. Custer explained that a strike was premature, because the parties were still negotiating.

In the meantime, Wehrli was proceeding unilaterally with his sales plans. By June 1, 1992, he had found two buyers for the trucks--his son Robert and a current driver, Richard Downs. He also placed advertisements in local trade papers, which yielded the names of ten prospective outside buyers. By the last week in June, Wehrli had handshake agreements with five individuals to sell nine trucks. Between June 28 and 30, he transferred title in those trucks to the new owners.

The financial terms that Wehrli set for the truck sales were favorable for the purchasers, but in return they gave up almost all control over the use of the trucks. No down payment was necessary, and Wehrli supplied the necessary financing. Each new owner-operator was to be paid $14 per cubic yard hauled, out of which $1 would go to pay principal on the debt. Wehrli retained a security interest in the trucks, under which he was entitled to find a buyer in default if NRM had a good faith belief that the driver was failing to perform the terms of the sales contract. Most importantly, there was a "first priority" provision that required the buyers to give first priority to the hauling needs of NRM so long as NRM provided reasonable notice of its intent to use the subcontractor; this requirement continued until the principal on the truck was paid off. The sales contract forbade the buyers from working for NRM's competitors within a fifteen mile radius of NRM's plant. The new owner-operators were also entitled to purchase subsidized fuel at the NRM facility and to call on NRM and WEC mechanics to perform all truck repairs. Finally, owner-operators were encouraged to store their vehicles at the NRM facility free of charge.

On July 1, five owner-operator subcontractors began hauling for NRM under these terms. Except for the nominal change in ownership of the trucks and the fact that the new drivers were not part of the bargaining unit, there were no meaningful changes in the day-to-day business of hauling at NRM. The owner-operators all hauled exclusively for NRM; they received their hauling assignments from the same individuals and according to essentially the same procedures as the unit

employee drivers had; they attended the same monthly safety meetings that NRM had always held; and they refueled, repaired, and stored their trucks at the High Grove Street facility.

Meanwhile, throughout June and July, the collective bargaining negotiations with the Union continued. There was at least one meeting in early June, and on June 15 the parties met with a federal mediator. The Union modified its offer at that meeting, as did NRM. Wehrli continued to insist on a one-year roll-over and the deletion of Article 24, but he proposed wage and benefit adjustments modeled after the Union's recently ratified contract with NIRMA. Union members rejected NRM's offer and two days later they went on strike. NRM and the Union held brief meetings June 21 and 22. At the June 22 meeting, Custer asked Wehrli how the strike might be resolved, and Wehrli responded that it was too late to resolve the strike because the trucks had already been sold. Custer requested information documenting the sales, but he did not receive it. Wehrli followed up the June 22 meeting with a letter to Custer declaring that the parties had reached impasse on the proposal to sell the trucks and subcontract NRM's hauling business. Custer rejected that claim, and the parties met again on June 25. The Union offered another modified contract proposal. NRM rejected it and instead responded on the same day with a faxed "Final Contract Proposal."

On July 1, non-unit subcontractors began delivering NRM's ready mix, and the parties held another negotiating meeting. The Union made additional concessions, and Custer told Wehrli that it would be willing to consider appropriate modifications of Article 24. At this meeting, Custer also repeated his request for information regarding NRM's sale of its trucks. The next day, the Union's counsel sent a letter formally requesting information regarding terms and conditions of the sale of the trucks. NRM responded with a letter stating that it did not believe that the information was relevant to the ongoing collective bargaining negotiations and that the Union had to demonstrate the relevance of each document it sought access to before NRM would disclose it. The Union did not respond.

The parties met again in late July and in early August. At the August 7 meeting, the Union made a series of new proposals which NRM rejected. Finally, on August 18, NRM informed the Union by letter that it intended to sell all its remaining trucks and proposed the elimination of an additional term in the collective bargaining agreement. In the letter, NRM reminded the Union that it considered the parties to be "at an

impasse on the issue of [NRM's] plan to subcontract all delivery work," but assured the Union that NRM continued to be willing to negotiate other aspects of the collective bargaining agreement.

The strike that began June 17 continued throughout this period of negotiation. Wehrli, who had already encouraged unit workers to take part in his plan to shift unit hauling work to subcontractors at the employee meetings in May, continued to talk to the striking workers about it on the picket line. Wehrli informed the strikers that he was selling his trucks and that if they wanted to continue hauling for NRM they would have to become owner-operators. He explained that once the trucks were sold there would be no more work for them. Wehrli also told striking workers that they could avoid Union sanctions for crossing the picket line by signing documents making them "financial core" members. NRM subsequently included instructions on how to become a financial core member and a form for doing so in paychecks distributed to the strikers.

Despite these efforts, most of the NRM drivers chose to remain loyal to the Union and continue the strike. In February of 1993, Custer sent NRM a letter stating that twenty-four named strikers wanted to return to work unconditionally. NRM refused to reinstate them.

The Union filed a number of charges with the National Labor Relations Board during the course of these events. Based on these charges, the General Counsel ultimately issued a consolidated complaint against NRM and its affiliated companies. The complaint began by asserting that NRM, T&W, and WEC comprised a single employer, as did NRM and six other corporate entities (representing the "new" independent trucking companies that took ownership of some of the vehicles). Substantively, it claimed that NRM (meaning for our purposes the whole group) violated sections 8(a)(5), (3), and (1) of the Act in several respects: by interfering with the employees' union activities through interrogation and threats (section 8(a)(1)); by direct dealing with represented employees, unilaterally transferring bargaining unit work to non-bargaining unit employees, and refusing to provide information to the Union (sections 8(a)(5) and (1)); and by discharging unit employees whose work had been reassigned and refusing to reinstate unfair labor practice strikers upon their unconditional offer to return to work (sections 8(a)(3) and (1)).

The administrative law judge dismissed the

charges in their entirety, but the Board reversed. 329 NLRB No. 19. It upheld the charges and ordered the company to cease and desist from the unfair labor practices it had found, to restore the delivery work to the unit employees, and to reinstate both those who lost their jobs as a result of the unilateral transfer of the delivery work to the owner-drivers and those who were not reinstated after the unfair labor practice strike.

## II

In reviewing the Board's decision, we give substantial deference to both its findings of fact and its interpretations of the Act. Factual determinations must be upheld if they are supported by substantial evidence on the record. 29 U.S.C. sec. 160(e). See NLRB v. Roll & Hold Warehouse & Dist. Corp., 162 F.3d 513, 517 (7th Cir. 1998); U.S. Marine Corp. v. NLRB, 944 F.2d 1305, 1313-14 (7th Cir. 1991) (en banc). With respect to questions of law, we defer to the Board's interpretation of the statutes it is charged with administering unless its view is arbitrary or capricious. See NLRB v. GranCare, Inc., 170 F.3d 662, 666 (7th Cir. 1999) (en banc).

### A. Single Employer Status

NRM first challenges the Board's conclusion that NRM, WEC, and T&W are a single employer for purposes of liability under the Act. We must decide first whether the legal standard the Board used to make this determination was a permissible one. If it is, then the single employer finding is a factual determination subject only to substantial evidence review. NLRB v. Emsing's Supermarket, Inc., 872 F.2d 1279, 1289 (7th Cir. 1989). NRM's attack is against both the legal standard the Board used and its factual conclusions, but we find no reversible error in either./1

The Board acts within its discretion when it treats as a single employer firms that operate as an integrated enterprise and "exert[ ] significant control over" the employees in question. G. Heileman Brewing Co. v. NLRB, 879 F.2d 1526, 1530 (7th Cir. 1989). In this case, the Board used its standard four factor test to determine whether the companies were sufficiently integrated to constitute a single employer: (1) common management; (2) centralized control of labor relations; (3) interrelation of operations; and, (4) common ownership or financial control. See Radio and Television Broadcast Technicians Local Union 1264 v. Broadcast Service of Mobile,

Inc., 380 U.S. 255, 256 (1965). NRM concedes that this was the proper legal approach in general, but it argues that the Board erred by failing to give primacy to the second factor, centralized control of labor relations. The statute, however, does not impose such an inflexible weighting requirement on the Board, nor has the Board adopted such a rule for itself. At most, the Board has commented that centralized control of labor relations is a particularly important factor, see, e.g., Fedco Freightliners, Inc., 273 NLRB 399 (1984), but it has also consistently said that this is a contextual inquiry and no one factor is determinative. Id. at 399; Bistritzky v. Service Employees Int. Union, Local 32E, AFL-CIO, 323 NLRB 524 (1997); NLRB v. Carson Cable TV, 795 F.2d 879, 881 (9th Cir. 1986). The listed factors merely help to guide the Board as it assesses "whether there exists overall control of the critical matters at the policy level." Emsing's Supermarket, Inc., 284 NLRB No. 41 (June 18, 1987), enforced 872 F.2d. 1279 (7th Cir. 1989).

On the facts, we find that the Board's single employer finding is adequately supported by substantial evidence. First, as the Board noted, there is evidence of common ownership. Wehrli and his wife owned NRM; Wehrli was the sole owner of WEC; and Wehrli owned 50% of T&W. There is also substantial evidence of shared management. Wehrli was an officer in each of the companies; he was president of NRM and WEC and he was secretary, and one of only two directors, of T&W. The other director of T&W, Bob Tilly, was a maintenance supervisor at NRM and assumed management responsibilities at WEC on or shortly before July 1, 1992. As the Board pointed out, the only other individuals involved in the management of these companies were Wehrli's wife, his son Scott, and Jerry Doll. Wehrli also testified before the ALJ that in the first four months of 1992 it was his daily practice to "come in and spend time with each of the managers and officers and whatever titles they had of the various companies and we would go over major problems or issues that they had that they were working on." Finally, there was evidence of operational integration among the three companies, including a shared location, informal sharing of labor among the companies, and the fact that T&W and WEC served primarily, if not exclusively, the hauling and maintenance needs of NRM. Under these circumstances, the Board was entitled to conclude that the companies shared common ownership and management.

Indeed, the only factor where the record does not strongly support the Board's conclusion is the one NRM has targeted: whether there was centralized control of labor relations.

Nonetheless, there is significant evidence that such centralized control existed, and even if it did not extend to all three companies, the absence of one factor is not fatal to the Board's conclusion. There is no dispute that Wehrli controlled labor relations for NRM. He was president of the company and represented it during negotiations with the Union. With respect to T&W, Wehrli was one of only two directors and on at least one occasion it was Wehrli rather than Tilly who met with the T&W workers to inform them of the consequences of not continuing to work during the NRM drivers' strike. As the Board concedes, there is little direct evidence that Wehrli controlled labor relations at WEC, but the record permits the inference that he did so. He was president of the company, regularly involved himself in the management of WEC, and exercised substantial control over major budgetary decisions. The record also suggests that it was Wehrli who directed the use of WEC and NRM employees in constructing a new ready-mix batch plant for NRM at the High Grove Street facility.

Taken as a whole, substantial evidence indicates that NRM, WEC, and T&W were highly integrated and that Wehrli, assisted by a small group of primarily family members, exercised substantial control over all aspects of the companies' affairs. We therefore find that the Board's decision to treat them as a single employer is entitled to enforcement.

B.  Failure to Bargain

The Board's decision in this case rested on one fundamental finding: that NRM's sale of its trucks was part of a plan to shift unit work to non-bargaining unit subcontractors, and that this plan was a mandatory subject of bargaining. NRM has urged all along (successfully to the ALJ) that it made an entrepreneurial decision to go out of the trucking business and that it therefore had no obligation to bargain with the Union over this plan. The Board rejected this contention, finding that NRM had not changed the basic nature of its operations. Instead, motivated by the desire to reduce labor costs, "NRM merely replaced the employees driving trucks with other employees under the 'owner-operator' rubric (or in some cases the same employees under the new title), maintaining essentially the same control over them that it had always enjoyed." 329 NLRB No. 19 at 8. As a result, the Board concluded, NRM's plan amounted to subcontracting unit work, and under section 8(a)(5) of the Act NRM was required to bargain to impasse prior to implementing it.

Before addressing the Board's decision on the merits, it is important to explain how the truck sales should, and should not, be assessed. NRM has devoted considerable energy in its appellate briefs to explaining why the sales were not "sham transactions," as that term is used in alter ego or single employer cases. See, e.g., NLRB v. Dane County Dairy, 795 F.2d 1313, 1322 (7th Cir. 1986). But, as we read the Board's opinion, it was not invoking that doctrine (despite its somewhat careless use of the phrase "sham transaction" here and there). It was not the Board's contention that NRM continued to own the trucks at issue; there is no dispute that title was legally transferred. The Board was saying only that the transactions were phony, or "sham," insofar as their employment consequences were concerned. NRM sold the trucks, but it did so as part of a plan that allowed it to remain in the business of delivering ready-mix, albeit using non-union subcontractors instead of bargaining unit employees. But that was exactly the Board's problem: a company cannot, consistent with the labor laws, shift unit work to subcontractors in order to save on labor costs without first bargaining in good faith to impasse.

The Board's conclusion that NRM's plan to shift its hauling business away from the bargaining unit and to subcontractors was a mandatory subject of bargaining is both based on a reasonable interpretation of the Act and supported by substantial evidence in the record. Section 8(a)(5) of the Act requires an employer to "bargain collectively with the representatives of his employees." The Act defines collective bargaining as "the performance of the mutual obligation of the employer and the representative of the employees to . . . confer in good faith with respect to wages, hours and other terms and conditions of employment." 29 U.S.C. sec.158(d). The Board appropriately relied on Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203 (1964), to support its conclusion that NRM's transfer of its hauling work to non-union subcontractors was a change in the terms and conditions of employment over which NRM was obligated to bargain. In Fibreboard, the Supreme Court found that a company's decision to contract out maintenance work in order to save on labor costs amounted to "replac[ing] existing employees with those of an independent contractor to do the same work under similar conditions of employment." 379 U.S. at 213. In such a situation, it held, the employer violates the Act if it does not first bargain to impasse with the union. See also First National Maintenance Corp. v. NLRB, 452 U.S. 666, 679-80 (1981). After Fibreboard and First National Maintenance, when an employer chooses to subcontract unit work in

order to save on labor costs, that choice typically does not involve a change in the scope and direction of the enterprise and thus is not a core entrepreneurial decision beyond the scope of the Act's bargaining obligation. See Rock-Tenn Co. v. NLRB, 101 F.3d 1441, 1446 (D.C. Cir. 1997) (concluding bargaining was mandatory because shift of unit work to subcontract hauling company to save on labor costs "is a prototype Fibreboard case").

In this case, the Board properly found that NRM's sale of its trucks was simply an element of its plan to switch unit work to lower-cost subcontractors and that under Fibreboard this plan could not be implemented until impasse had been reached. The record amply supports this characterization. Before and after July 1, 1992, NRM's business involved the delivery of ready-mix concrete to its customers. Neither the scope nor the manner of this aspect of its business changed in any way after July 1. To the contrary, Wehrli ensured that things would stay functionally the same by carefully structuring the sale of NRM's trucks to give NRM nearly complete control over how the trucks were used. After July 1, the same trucks were still hauling exclusively NRM's product; the drivers still received their orders from the same dispatcher and in accordance with essentially the same procedures previously used; and the trucks were still refueled, repaired, and stored at the High Grove Street site. The only identifiable difference in how NRM hauled ready-mix concrete after July 1 was that the drivers of the trucks were no longer covered by the Union's collective bargaining agreement.

There is also substantial evidence in the record that NRM's motivation for switching to subcontract haulers was to save on labor costs. Wehrli himself admitted that this was what he was doing, and his statements at the negotiating meetings leave no doubt about the matter. Wehrli's own testimony is sufficient to support the conclusion that the plan to move to an owner-operator system was motivated by a desire to reduce labor costs. This is precisely the kind of concern that Fibreboard and First National Maintenance instruct is particularly amenable to resolution through collective bargaining. 379 U.S. at 214; 452 U.S. at 669.

We agree with the Board that this case is governed by Fibreboard. At oral argument NRM argued strenuously that it was entitled to sell its trucks, but that is not the point. What NRM was not entitled to do under these circumstances was to shift unit work to non-union subcontractors without first bargaining to impasse with the Union. Of course, had NRM

negotiated to impasse before transferring the work, there would have been no violation of the Act. We turn now to the question of whether it did so, or, if not, whether the Union waived its right to bargain over the issue.

## C. Negotiating to Impasse

An employer violates sections 8(a)(1) and (5) of the Act when it unilaterally changes a condition of employment that is a mandatory subject of bargaining before bargaining has reached an impasse. NLRB v. Katz, 369 U.S. 736, 743 (1962); Lapham-Hickey Steel Corp., 904 F.2d 1180, 1185 (7th Cir. 1990). Because an employer is only required to bargain in good faith and may ultimately refuse to amend its proposals, once impasse has been reached the employer may implement its original proposals without violating the Act. Duffy Tool & Stamping, L.L.C. v. NLRB, 233 F.3d 995, 996 (7th Cir. 2000). In the context of ongoing collective bargaining negotiations, however, we have recently held that the parties are required to reach an overall impasse before an employer can unilaterally implement individual proposals made during the course of collective bargaining. Id. at 999; see also Visiting Nurse Services of Western Massachusetts, Inc. v. NLRB, 177 F.3d 52, 58 (1st Cir. 1999) (same).

NRM's contention that the parties had reached impasse on the subcontracting issue is precisely the kind of partial impasse argument foreclosed by Duffy. Partial impasse does not justify unilateral implementation of the contested item, and it is clear both that nothing approaching total deadlock had occurred between the Union and NRM at the time NRM unilaterally sold the trucks, and that NRM's decision to sell the trucks was not part of a larger plan to go out of business. As our earlier review of the course of events shows, collective bargaining negotiations were ongoing until at least August 7 or 18, long after NRM implemented its truck sale plan.

NRM contends in the alternative that it was not required to negotiate to impasse because the Union had waived its right to bargain over the issue of subcontracting. Duffy recognized that there could be exceptions to the overall impasse rule in the event that the employer could demonstrate that the union waived its right to bargain over a particular proposal or that the company would suffer severe economic consequences from a delay in implementation. 233 F.3d at 997.

To establish waiver, an employer must prove that the union's waiver of its statutorily

protected right was "clearly and unmistakably articulated." Beverly California Corp. v. NLRB, 227 F.3d 817, 838 (7th Cir. 2000). Alternatively, a union can relinquish its right to bargain if it "insists on continually avoiding or delaying bargaining." Serramonte Oldsmobile, Inc. v. NLRB, 86 F.3d 227, 235 (D.C. Cir. 1996). NRM does not assert that the Union engaged in any such dilatory conduct; it must therefore show that the Union unmistakably waived its right to bargain over NRM's proposal to subcontract hauling services. NRM finds such a waiver in the Union's repeated refusal to accept its plan to shift hauling work to non-union subcontractors and its proposed modifications of Article 24. The Board properly rejected this argument. NRM's waiver theory is simply a restatement of its single-issue impasse theory using different terminology. In the context of collective bargaining negotiations, the Union's mere refusal to budge on a particular issue cannot constitute a waiver. Indeed, the Union expressed its willingness to discuss changes to Article 24 as late as the July 1 meeting, which further weakens NRM's argument. At no time did the Union refuse to negotiate or fail to negotiate in good faith over the terms of the successor contract. The record lends ample support to the Board's conclusion that while the Union was opposed to the truck-selling plan, "it expressed willingness to try to find ways by which NRM's economic concerns could be met" and that "[t]he Union was thus responsive and persistent rather than dilatory and evasive in the negotiations." 329 NLRB No. 19 at 9. Under these circumstances, there was no waiver.

NRM finally claims that the strike entitled it to implement its shift to a system of subcontract haulers, but here it is confusing apples and oranges. It is true that when workers strike, an employer may temporarily subcontract unit work in order "to enable the employer to continue operating in an emergency situation thrust upon it by a strike." American Cyanamid Co. v. NLRB, 592 F.2d 356, 360 (7th Cir. 1979). But the mere fact that employees go on strike does not relieve the employer of the duty to bargain to impasse, and thus it does not permit an employer permanently to subcontract out unit work in the absence of impasse. Id. All of the evidence supports the Board's conclusion that NRM's subcontracting was not a temporary response to circumstances created by the strike, but rather the implementation of a carefully formulated plan for a permanent shift of unit work away from employees and over to subcontractors.

D.  Failure to Provide Relevant Information

Section 8(a)(5) of the Act imposes on the employer a duty to bargain in good faith. This duty encompasses an obligation on the employer to disclose information relevant to the bargaining process. NLRB v. Truitt Mfg. Inc., 351 U.S. 149, 152-53 (1956). Although there are exceptions, in general an employer violates section 8(a)(5) by failing to disclose relevant information upon request. NLRB v. George Koch Sons, Inc., 950 F.2d 1324, 1330-31 (7th Cir. 1991). Whether the requested information was relevant is the threshold question and the only one in dispute in our case. The information the Union wanted was about NRM's proposal to subcontract unit work. The burden was on the Union to demonstrate the relevance of the requested information under the very liberal relevancy standard applied in these situations. See NLRB v. Acme Indus. Co., 385 U.S. 432, 437 n. 6 (1967) (applying a discovery-type relevancy standard).

The Board concluded that NRM violated sections 8(a)(5) and (1) of the Act by failing to give the Union the requested information about the sale of its trucks. At the July 1, 1992, negotiating session, Wehrli indicated to Custer that it was too late to negotiate a contract with NRM that covered the NRM drivers, because the trucks they had been driving had already been sold. Custer testified that he promptly asked Wehrli to provide him with documentation of the sales. On July 10, counsel for the Union sent a letter again requesting information regarding the nature and terms of the truck sales. Rather than providing the requested information, NRM's counsel responded with a letter disputing the Union's right to have access to the information and demanding that the Union explain how "each of the documents requested is reasonably calculated to elicit information which the Union may need to properly represent its members and a citation to case authority which supports the request." The Union chose not to respond and instead filed an unfair labor practices charge.

On these facts, there is again ample evidence to support the Board's conclusion that NRM violated the Act. The Union's request for information arose directly out of a subject the parties were discussing in connection with their collective bargaining. Under the Court's reasoning in Truitt, 352 U.S. at 152-53, the Union was entitled to know exactly what circumstances it faced. If NRM's truck sale claim was "important enough to present in the give and take of bargaining," then the Union was entitled to "some sort of proof of its accuracy." Id. NRM was aware of the relevance of this information to the Union's ability to represent unit members, and NRM's subsequent effort to deny its relevancy

is precisely the kind of bad faith negotiating tactic that is prohibited by section 8(a)(5) of the Act.


   E.  Direct Dealings, Negotiations, and Threats

   Implicit in the obligation to bargain in good faith "is the principle that the employer is not to go behind the union's back and negotiate with individual workers, nor otherwise to undermine the union's status as exclusive bargaining representative." Szabo v. U.S. Marine Corp., 819 F.2d 714, 718 (7th Cir. 1987); see also Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 683-85 (1944). This prohibition forecloses individual negotiations with unit employees, in most cases even if collective bargaining negotiations have reached an impasse. McNealy v. Caterpillar, Inc., 139 F.3d 1113, 1118 (7th Cir. 1997). Furthermore, the duty to refrain from undermining the union's status as exclusive bargaining agent precludes promises of benefits or threats of sanctions to union members that have the effect of reducing the employees' support for their union. Beverly California Corp., 227 F.3d at 817, 832-33. The Board concluded that NRM repeatedly engaged in these forms of prohibited activity.

   We see no need to lengthen this opinion with yet another rehearsal of the facts. Wehrli's meetings with the drivers while negotiations were still underway and his warnings that those who did not buy a truck would be laid off support the Board's findings. NRM attempts to cast these meetings as nothing more than occasions during which Wehrli was providing accurate information to employees about a "business opportunity." In the context of the ongoing collective bargaining negotiations over the very proposal at issue, however, we find the Board's characterization more accurate: "[T]he meetings were efforts to enlist the employees in the sham transactions by which [NRM] would carry on the ready mix delivery operations without the obligations or costs of a union contract." 329 NLRB No. 19 at 11. These meetings amounted to direct dealing in violation of section 8(a)(5) of the Act.

   With respect to the section 8(a)(1) violation that the Board found in connection with Wehrli's statements that the employees would lose their jobs if they did not accept the terms of NRM's subcontracting plan and that subcontractors would not be members of the collective bargaining unit, the record again supports the Board. We find no merit in NRM's procedural objection to the effect that the charges complaining of the alleged threats made at the meetings and to individual NRM employees were not timely filed. The threat

charges arose from the General Counsel's investigation into precisely the situation about which the Union had complained in its charge filed June 9, 1992. The threat charges properly related back to the June 9, 1992 complaint, and the Board properly considered them.

NRM's argument on the merits that the employees could not have seen these statements as "threats," because Wehrli was simply inviting the employees to negotiate new agreements as owner-operators, is meritless as well. To constitute a prohibited threat under the Act, a statement must only "reasonably tend[ ] to interfere with, restrain, or coerce employees in the free exercise of their protected rights." NLRB v. Q-1 Motor Express, Inc., 25 F.3d 473, 477 (7th Cir. 1994). The relevant perspective is that of the employees. Wehrli made it clear to unit workers at the May meetings and on the picket line that their only choice was between becoming subcontract owner-operators outside the current bargaining unit and losing their jobs. NRM concedes that this happened. The Board was entitled to conclude that the employees with whom Wehrli talked would have felt coerced into abandoning the Union in the midst of the Union's ongoing collective bargaining negotiations with NRM. The Board's conclusion that NRM violated section 8(a)(1) is well within the bounds that this record would support.

F.  Wrongful Discharge and Failure to Reinstate

The Board found that NRM violated sections 8(a)(5) and 8(a)(3) of the Act by transferring unit work to non-unit personnel in order to eliminate the Union as the unit bargaining representative. The Board also found that NRM violated section 8(a)(3) of the Act by failing to reinstate employees who made an unconditional offer to return. Again, we find the Board's conclusions to be supported by substantial evidence in the record. The charges were sufficiently related to the initial complaints to be properly before the Board, and our approval of the Board's section 8(a)(5) analysis with respect to the transfer of unit work to non-unit subcontractors is equally applicable here.

Section 8(a)(3) of the Act prohibits "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." The Board reasoned that NRM violated section 8(a)(3) when it forced union employees to choose between abandoning their union to become owner-operator subcontractors and

having no job at all. In effect, the Board viewed NRM's statements as a promise that there would only be work for those who renounced their union membership. The Board properly concluded that imposing this impermissible choice upon the unit workers was a violation of the Act. See Canteen Corp. v. NLRB, 103 F.3d 1355, 1365-66 (7th Cir. 1997). In this case, those NRM drivers who refused to abandon the Union in order to participate in NRM's unilaterally implemented switch to subcontract hauling were constructively discharged as NRM sold its trucks and replaced bargaining unit workers with owner-operator subcontractors. The fact that the unit employees were on strike at the time is of no consequence. We thus affirm the Board's conclusion that NRM violated section 8(a)(3) of the Act by offering only those who would abandon the bargaining unit continued employment.

Finally, the Board found that NRM violated section 8(a)(3) of the Act by refusing to reinstate striking workers who made an unconditional offer to return to work. It is settled that "unfair labor practice strikers are entitled to reinstatement upon making an unconditional offer to return to work." Lapham-Hickey Steel Corp., 904 F.2d at 1188; accord Richmond Recording Corp. v. NLRB, 836 F.2d 289, 292 (7th Cir. 1987). The Board found, and we agree, that this was an unfair labor practices strike,/2 and there is substantial evidence in the record to support the Board's conclusion that an unconditional offer was made and that NRM did not reinstate the workers. Given the absence of any contrary evidence in the record, this evidence is sufficient to support the Board's finding that NRM failed to reinstate the striking workers in violation of the Act.

III

Last, NRM argues that the Board's order requiring restoration of NRM's trucking operations and reinstatement of employee truck drivers should not be enforced because it is unreasonable and imposes an "undue or unfair burden." NRM concedes, however, that it did not make this argument before the Board. The Act very clearly states that an objection "not urged before the Board . . . shall [not] be considered by the court, unless the failure or neglect to urge such objections shall be excused because of extraordinary circumstances." 29 U.S.C. sec.160(e). NRM does not point to any extraordinary circumstances justifying its failure to urge this objection before the Board and thus our hands are tied. Relying on our opinion in NLRB v. Thill, Inc., 980 F.2d 1137 (7th Cir. 1992), NRM suggests that because

enforcement of the Board's order is an equitable remedy we should use our equitable powers to decline to enforce the injunction. Even if this were an avenue open to us (which we doubt, given our duty to defer to the Board), we would decline to take it in this case, notwithstanding the Board's unfortunate delay in issuing its opinion. First, this is a point NRM saved for its reply brief, and it is therefore not properly before us. Second, as the Supreme Court held in NLRB v. Ironworkers, 466 U.S. 720, 725-26 (1984), courts do not have discretion to impose the costs of delay by the Board upon the wronged employees. Finally, the overall equities in this case do not favor NRM. It committed numerous violations of the National Labor Relations Act, and those violations led to the improper dismissal of bargaining unit employees. In contrast, there is no evidence of any wrongdoing on the part of the Union or the striking workers. To refuse to enforce the Board's order because of time delays that no one alleges are attributable to the Union or the unit workers would unjustifiably compound their injury.

In addition, we are not persuaded that compliance with the Board's order will impose an unusual hardship on the employer. NRM contends that the order is unreasonable because it would be forced to buy back all its trucks from the owner-operators and revert to a system of hauling that it has not used in almost eight years. The order, however, says nothing about where NRM should procure its trucks, or whether it should buy or lease them. NRM merely needs to make trucks available so that the reinstated bargaining unit employees can return to hauling ready-mix. Furthermore, there is no evidence that NRM will have any particular difficulty returning its hauling business to unit employees; NRM apparently continues to deliver ready-mix to its customers just as it did eight years ago. NRM has given us no reason to think that the transition from subcontract hauling to in-house hauling would be any more difficult than the 1992 switch to using subcontractors. For all these reasons, we conclude that the Board's order is entitled to be Enforced in its entirety.

FOOTNOTES

/1 Neither party has raised the question whether this decision is exclusively one to be made under federal law, or if state law bears on it as well. We therefore proceed, as the parties did, as if it is governed by federal law.

/2 NRM has not tried to justify its refusal to rehire on the ground that it had hired replacement workers for economic strikers, and

thus was entitled to turn away returning workers who wanted jobs that had been filled. This is understandable, as NRM's entire point has been that the hauling subset of its business had been eliminated.